# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 1, 2024

## IN RE ROYALTY Y.

**Appeal from the Juvenile Court for Shelby County**
**No. FF-6480      W. Ray Glasgow, Special Judge**

_____

## No. W2023-01333-COA-R3-PT

_____

In this case involving termination of the mother's parental rights to her child, the trial court found that four statutory grounds for termination had been proven by clear and convincing evidence. The trial court further found that clear and convincing evidence demonstrated that termination of the mother's parental rights was in the child's best interest. The mother has appealed. Having determined that the trial court erred by failing to make findings concerning the mother's affirmative defense of lack of willfulness relative to the statutory grounds of abandonment through failure to visit and support the child, we reverse the trial court's reliance on those grounds. We affirm the trial court's judgment in all other respects, including the termination of the mother's parental rights to the child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY ARMSTRONG, JJ., joined.

Anna L. Phillips, Germantown, Tennessee, for the appellant, Marissa Y.

Jonathan Skrmetti, Attorney General and Reporter, and Katherine P. Adams, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. Factual and Procedural History

On November 17, 2022, the Tennessee Department of Children's Services ("DCS") filed a petition in the Shelby County Juvenile Court ("trial court") seeking to

terminate the parental rights of Marissa Y. ("Mother") to her child, Royalty Y. ("the Child"), who was born in April 2021. DCS averred that the Child had been adjudicated dependent and neglected by the trial court in July 2022, having been brought into DCS custody shortly after her birth due to Mother's "mental health crisis that kept her from appropriately and safely parenting the child." As grounds for termination, DCS alleged that (1) Mother had abandoned the Child by failing to visit or support the Child during the four months prior to the petition's filing, (2) the conditions leading to the Child's removal from Mother's custody persisted, and (3) Mother had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child.[1] DCS further asserted that termination of Mother's parental rights was in the Child's best interest.

The record demonstrates that DCS had filed a dependency and neglect petition concerning the Child on April 27, 2021, alleging that after Mother gave birth to the Child, the hospital employees had expressed concerns regarding Mother's mental health due to Mother's behavior. According to DCS, when the case manager attempted to meet with Mother at the hospital, Mother had been admitted to Lakeside, a mental health facility, after being evaluated by a mobile crisis unit. Because of Mother's admission to Lakeside, the Child was left unsupervised and was placed into DCS custody via an *ex parte* protective custody order entered that same day.

The trial court conducted a preliminary hearing on April 29, 2021. Although Mother's counsel was present for the hearing, the resultant order indicates that Mother was not present because she remained hospitalized at Lakeside. The court also noted that Mother had no projected discharge date at that time. The court ordered that DCS maintain custody of the Child and that Mother would be allowed supervised visitation. During the ensuing months, DCS developed various permanency plans concerning the Child that were ratified by the court. However, Mother did not participate in the development of the plans. On May 24, 2022, DCS filed an affidavit executed by a case worker indicating that despite a diligent search, Mother could not be located.

The trial court conducted an adjudicatory hearing on July 28, 2022. The court noted in the resultant order that Mother was not present at the hearing and that her whereabouts were unknown. The court therefore adjudicated the Child dependent and neglected, stating that Mother could have no contact with the Child until she sought visitation through the court. Due to Mother's continued lack of visitation and progress, DCS filed its termination petition in November 2022.

Mother, through appointed counsel, filed an answer to the termination petition, denying the allegations of the petition and raising the affirmative defense of lack of

---

[1] DCS raised two additional grounds for termination that were voluntarily dismissed at trial.

willfulness. The trial court appointed a guardian *ad litem* to represent Mother and a separate guardian *ad litem* to represent the best interest of the Child.

On July 27, 2023, the trial court conducted a bench trial via electronic means. During trial, the court heard testimony from DCS team leader, Senetra Williams; DCS family services worker, Tonya Royal; the Child's foster mother ("Foster Mother"); and Mother. The court also received exhibits, including a copy of the DCS file concerning the Child. On August 23, 2023, the court entered an order terminating Mother's parental rights to the Child. The court found that DCS had proven the following statutory grounds by clear and convincing evidence: (1) abandonment by failure to visit, (2) abandonment by failure to financially support, (3) persistence of the conditions leading to the Child's removal from Mother's custody, and (4) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. After reviewing the statutory best interest factors, the court also determined that termination of Mother's parental rights was in the Child's best interest. Mother has appealed.

## II. Issues Presented

Mother presents the following issues for our review, which we have restated slightly:

1. Whether the trial court erred by failing to make findings regarding Mother's affirmative defense when determining that the grounds of abandonment by failure to support and visit had been proven.

2. Whether the trial court erred by finding that the conditions leading to the Child's removal persisted.

3. Whether the trial court erred by relying on inadmissible hearsay when determining that DCS had proven the ground of failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child.

DCS restates the issues as:

4. Whether the trial court properly determined that statutory grounds existed to terminate Mother's parental rights.

5. Whether the trial court properly determined that termination of Mother's parental rights was in the Child's best interest.

### III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or

substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Hearsay Evidence

We first address the question of whether the trial court erred by considering inadmissible hearsay evidence when concluding that DCS had proven grounds for termination. This question presents a threshold issue because the evidence admitted during trial potentially affects all of the statutory grounds relied upon for termination, as well as the best interest analysis. *See, e.g.*, *In re Carrington H.*, 483 S.W.3d at 522 ("In light of the interests and consequences at stake, parents are constitutionally entitled to fundamentally fair procedures in termination proceedings."). The issue of hearsay must therefore be addressed at the outset despite the fact that Mother only raised the issue as it relates to the ground of failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child.

During trial, DCS team leader Senetra Williams testified regarding her knowledge of the proceedings involving the Child. When doing so, Ms. Williams was allowed to testify regarding entries made by other DCS workers into the Tennessee Family and Child Tracking System ("TFACTS"), the system utilized by DCS for recording information pertaining to the children in its care.[2] The TFACTS entries were also entered as an exhibit at trial, pursuant to the business records hearsay exception found in Tennessee Rule of Evidence 803(6), which states:

---

[2] At trial, Mother's counsel objected to the admission of this testimony as hearsay.

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

As this Court has previously explained: "[Rule 803(6)] provides for the admission of records. It does not provide for the admission of the testimony of a witness as to his or her memory of what the record stated." *State, Dep't of Children's Servs. v. B.F.*, No. E2004-00338-COA-R3-PT, 2004 WL 2752808, at *3 (Tenn. Ct. App. Oct. 2, 2004). In other words, although documentary records such as the ones at issue here are admissible pursuant to Rule 803(6), provided that the proper foundation has been laid and that the records have met the requirements of Rule 803(6), *see In re Joseph G.*, No. E2012-2501-COA-R3-PT, 2013 WL 3964167, at *6 (Tenn. Ct. App. July 31, 2013), this does not mean that a witness may testify as to his or her understanding of what those records contain when the witness has no personal knowledge of such information. *See B.F.*, 2004 WL 2752808, at *3. Accordingly, we determine that the trial court erred in allowing Ms. Williams to testify regarding facts for which (1) she had no personal knowledge and (2) the source of her knowledge was her memory of a TFACTS entry made by someone else. We will therefore disregard such testimony when determining whether the evidence preponderates against the trial court's findings of clear and convincing evidence concerning the statutory grounds at issue and the best interest analysis.

Mother also challenges the trial court's reliance upon any TFACTS entries that do not meet the requirements of Tennessee Rule of Evidence 803(6) because they were not "made at or near the time" of the occurrence of the event being recorded.[3] DCS concedes this point in its appellate brief, citing *In re Demitrus M.T.*, No. E2009-02349-COA-R3-

---

[3] We note that Mother's argument on appeal regarding the admission of these records relates only to certain entries that were not contemporaneously recorded. Mother has not objected to any statements contained within the contemporaneously recorded entries on the basis of hearsay or otherwise. *See, e.g., In re R.C.V.*, No. W2001-02102-COA-R3-JV, 2002 WL 31730899, at *8 (Tenn. Ct. App. Nov. 18, 2002) (explaining that "every statement recorded in a business record is not necessarily admissible as evidence" (citing *Butler v. Ballard*, 696 S.W.2d 533, 536-37 (Tenn. Ct. App. 1985))). As such, we consider that issue to have been waived.

CV, 2011 WL 863288, at *20 (Tenn. Ct. App. Mar. 14, 2011), wherein this Court held that entries made more than a month following the recorded event were inadmissible under Rule 803(6) because they were not "made at or near the time" of the event. Based on this authority, we conclude that any entries that were recorded in an untimely fashion also will not be considered by this Court when reviewing the evidence to determine whether grounds were proven as well as the weight of the applicable best interest factors. *See In re Joseph G.*, 2013 WL 3964167, at *7 (eliminating one document within a collective exhibit as hearsay and evaluating the remaining evidence to determine whether a ground was properly supported).

## V. Statutory Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (West July 1, 2022, to current) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

In its final judgment, the trial court found that clear and convincing evidence supported the following grounds for termination: (1) abandonment by failure to financially support the Child, (2) abandonment by failure to visit the Child, (3) persistence of the conditions leading to the Child's removal, and (4) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. We will address each respective ground in turn, albeit in a slightly different order than presented in the appellant's statement of the issues.

A. Failure to Manifest an Ability and Willingness to
Assume Custody of or Financial Responsibility for the Child

The trial court found clear and convincing evidence that Mother had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. Concerning this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) (West July 1, 2022, to current) provides:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, DCS was required to show by clear and convincing evidence that (1) Mother failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Child and (2) returning the Child to Mother's custody would pose a risk of substantial harm to the Child's welfare. *See In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

Our review of the record in this matter demonstrates that the Child was brought into protective custody shortly following her birth. Mother had been evaluated at the hospital by a mobile crisis unit regarding her mental health after hospital staff had observed erratic behavior exhibited by Mother. Mother was transported and admitted to Lakeside for mental health care, leaving the Child without a guardian. When the preliminary hearing was conducted a few days later on April 29, 2021, Mother's attorney appeared on her behalf, and the trial court noted that Mother remained at Lakeside and had no discharge date. In the preliminary hearing order, the court directed that Mother would be allowed supervised visitation with the Child.

Documents from the trial court's file reflect that several permanency plans were developed and ratified during the ensuing months, but there is a dearth of evidence in the record demonstrating that Mother ever complied with any of the requirements of those plans. In fact, the contemporaneously recorded TFACTS entries demonstrate that DCS workers were often unable to locate Mother despite their efforts to find her. At one point in June 2021, a DCS worker reported that Mother had been offered an in-person or virtual visit with the Child but that Mother stated she just wanted pictures sent to her phone. In July 2021, Mother's friend reported to DCS that Mother had returned to Lakeside. DCS workers' attempts to reach Mother for the next few months were unsuccessful.

In October 2021, Foster Mother reported to DCS that Mother had scheduled a visit but had cancelled on the day of the visit. Foster Mother further indicated a similar occurrence in December 2021. On January 7, 2022, a DCS worker relayed that Mother had called about scheduling a visit but that when Mother was asked to choose a date and time, Mother indicated she would have to check the weather and call back. On January 19, 2022, Mother participated in a virtual visit with the Child. Foster Mother reported that Mother did not substantially engage with the Child, instead focusing the conversation on her own needs and Foster Mother's ability to help Mother.

A Foster Care Review Board meeting concerning the Child occurred on February 8, 2022, and the record reflects that although Mother had expressed that she would attend the meeting virtually, she failed to do so. On February 28, 2022, Foster Mother informed DCS that she had not heard from Mother in two weeks. Foster Mother further stated that during their last communication, she had offered Mother a visit with the Child but Mother replied that she would have to call back. Similarly, on April 5, 2022, Foster Mother reported to DCS that Mother had engaged in no visits with the Child.

Another Foster Care Review Board meeting occurred on October 6, 2022. The record from this meeting indicates that Mother was not present and her whereabouts were unknown. In addition, the record reflects that Mother had not completed any of the tasks required under the permanency plans. On October 24, 2022, the family services worker noted that she had endeavored several times to locate Mother, including calling known phone numbers, searching criminal and court records, and attempting other internet searches, to no avail. Over the next few months, DCS sent various documents to Mother's last known mailing and email addresses with no response.

The record indicates that Mother did appear for the initial setting of the termination trial on March 2, 2023. Mother did not have an attorney at that time and expressed her disagreement with the trial court's decision to appoint an attorney for her. Despite Mother's objection, the trial court appointed a new attorney to represent Mother and continued the hearing to a later date.

On April 3, 2023, DCS conducted a child and family team meeting regarding the Child. Mother did not appear, and the TFACTS entry reflects that Mother emailed DCS minutes before the meeting to inquire whether it could be rescheduled. Mother's attorney asked DCS to proceed with the meeting, and the DCS worker again noted that Mother was not in compliance with the permanency plan requirements.

In addition to these business records, we also consider the testimony of Ms. Royal, who explained that since assuming responsibilities as family services worker for the Child in February 2023, she had sent copies of permanency plans and the criteria for termination of parental rights to Mother, had discussed those documents with Mother, and had kept Mother apprised of meetings and hearings concerning the Child. During

trial, Mother acknowledged Ms. Royal's contact as well as contact by other DCS employees. Mother also acknowledged that she was aware the Child had continued in DCS custody since immediately after the Child's birth. However, Mother admitted that she had only participated in one virtual visit in January 2022 and had never paid any support. Mother claimed that she had never been at Lakeside, instead proffering that she had undergone mental health treatment at "Crestwyn" approximately six months before trial. Although Mother insisted that she had participated in follow-up appointments, she provided no other proof of having taken any steps toward remedying her mental health issues. Mother developed no further evidence regarding her living situation, her efforts to establish an ability to parent the Child, or her progress with permanency plan requirements. Mother also acknowledged that she had seven other children, none of whom were in her custody.

Based on our thorough review of the admissible proof, we determine that the evidence does not preponderate against the trial court's finding, by clear and convincing evidence, that Mother failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Child. Despite the Child's custody remaining with DCS for approximately twenty-eight months by the time of trial, a period which encompassed almost the Child's entire life, Mother demonstrated no progress toward completing the requirements of her permanency plans or otherwise enabling herself to provide adequate care for the Child. There was no proof that Mother had ever obtained any of the psychological or parenting evaluations that DCS mandated, and Mother's living situation at the time of trial is unclear from the record. For a substantial portion of the custody period, Mother's whereabouts were unknown to DCS because Mother did not maintain contact and could not be located. In addition, Mother did not visit with the Child, paid no support, and failed to forge a parent-child relationship. By reason of the evidence in the record, we agree with the trial court that DCS sufficiently proved the first prong of this statutory ground.

In further support of this statutory ground, DCS was also required to prove that returning the Child to Mother's custody would pose a risk of substantial harm to the Child's welfare. *See In re Neveah M.*, 614 S.W.3d at 674, 677. This Court has previously observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

- 10 -

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

In the case at bar, the trial court heard testimony from Ms. Williams, DCS team leader, who stated that the Child was bonded to Foster Mother and her husband and that the foster parents wished to adopt the Child. Likewise, Ms. Royal testified that she had observed the Child in Foster Mother's home and that the Child was happy and content there, as well as extremely attached to the foster parents. According to Foster Mother, the Child had been with the foster parents since she entered custody in April 2021, and they wished to adopt her. Foster Mother further articulated that the Child was doing well, was a "wonderful" child, and that she was happy and healthy. The contemporaneous TFACTS entries supplied further support for the conclusion that the Child was thriving in the foster placement and that no concerns had ever been expressed respecting the foster parents, their home, or their care of the Child.

In its termination order, the trial court found:

> [Mother] has had the opportunity to assert herself as a parent to [the Child], and she has not taken that opportunity. To return [the Child] to [Mother] at this late date would cause emotional harm to the child. [The Child] has been placed with [the foster parents] for over two years and is well-bonded to them. Removing her at this stage would cause emotional harm to [the Child] due to the length of time she has resided in their home.

Based on the evidence presented, we agree with the trial court's findings and determine that the evidence does not preponderate against the court's finding that DCS had proven this statutory ground by clear and convincing evidence. We therefore affirm the trial court's reliance in its termination order on the ground of failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child.

### B. Persistence of Conditions Leading to the Child's Removal

The trial court also determined that the statutory ground of persistence of the conditions leading to removal of the Child from Mother's custody had been proven by clear and convincing evidence. Relative to this statutory ground, the version of Tennessee Code Annotated § 36-1-113(g)(3) (West July 1, 2022, to July 1, 2023) in effect when the instant petition was filed provided:[4]

---

[4] This statutory section was amended effective July 1, 2023, by deleting the language contained in subsection (A) stating, "a petition has been filed in the juvenile court alleging that a child is," and substituting instead the language, "a child is alleged to be." *See* Tenn. Pub. Acts Ch. 253, S.B. No. 264.

(A)     The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

>   (i)     The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

>   (ii)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

>   (iii)   The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B)     The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

In the final judgment, the trial court summarized its findings regarding this statutory ground as follows in pertinent part:

> [The Child] has been in the custody of [DCS] for more than six (6) months preceding the filing of this petition, and the conditions which led to removal from the home or physical or legal custody of the parent still persist[.] . . . [Mother] has not made such a lasting adjustment as to enable the child to be returned to her safely. [Mother] has not complied with the action steps set forth in the permanency plans, which were meant to remedy the need for foster care. [The Child] has been in foster care for over two years, and any lasting adjustment does not appear to be on the horizon. The Court notes that [Mother] remembers names and conversations, and she has the ability to articulate what [the Child] may need on a basic level, but she has not taken the opportunity to assert herself as the parent of this child.

Upon careful review, we determine that a preponderance of the evidence supports the trial court's findings as to this statutory ground. By the time of trial, the Child had continued in protective custody for approximately twenty-eight months, far longer than the statutory six-month minimum. As established through our review of the evidence

- 12 -

respecting the previous statutory ground, the condition that precipitated the Child's removal, namely Mother's mental health, had not been dealt with sufficiently. In addition, other conditions existed that would likely cause the Child to be subjected to further neglect and prevented the Child's safe return to Mother's care, including Mother's housing instability and failure to meet the requirements of the permanency plans. The record clearly demonstrates that Mother had repeatedly declined offers to visit the Child, failed to show for scheduled visits, failed to maintain contact with DCS and the foster parents, and failed to avail herself of DCS services.

Concerning the focus of the statutory ground at issue, persistence of conditions, this Court has recently explained:

> The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." [*In re Audrey S.*, 182 S.W.3d,] 874 [(Tenn. Ct. App. 2005)]. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Thus, the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

*In re Kaisona B.*, No. W2020-01308-COA-R3-PT, 2021 WL 4319624, at *6 (Tenn. Ct. App. Sept. 23, 2021). "Under this [persistence of conditions] ground, a parent's inability to eliminate such conditions does not need to be willful." *In re Braden K.*, No. M2020-00569-COA-R3-PT, 2020 WL 5823344, at *9 (Tenn. Ct. App. Sept. 30, 2020) (citing *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012)).

In the action at bar, the record contains no evidence that Mother had improved her situation in any meaningful way while the Child remained in DCS custody. Mother did not establish a safe environment for the Child despite having over two years to do so. Although Mother asserts a desire to care for the Child, she has never demonstrated any significant change in her circumstances such that it would safe for the Child to be returned to her custody. This case presents a clear picture that continuation of the parent and child relationship would greatly diminish the Child's chances of "early integration into a safe, stable, and permanent home," such as the home she has enjoyed with the foster parents. As such, we conclude that the evidence does not preponderate against the trial court's finding that DCS also proved the ground of persistence of conditions by clear and convincing evidence.

C. Statutory Abandonment

Finally, concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (West July 1, 2022, to current) provides as relevant to this action:

> (g)      Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> > (1)      Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

The version of Tennessee Code Annotated § 36-1-102(1)(A) (West July 1, 2022, to July 1, 2023) in effect when the termination petition was filed provided the following definition of abandonment as pertinent here:[5]

> For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> > (i)      For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

1. Abandonment by Failure to Support

The trial court determined that Mother had abandoned the Child by failing to support or make reasonable payments toward the Child's support for the four months preceding the termination petition's filing date. The court specifically found that Mother had not provided any financial support for the Child "since the Child entered foster care

---

[5] Effective July 1, 2023, the General Assembly has amended Tennessee Code Annotated § 36-1-102(1)(A)(i) to make the applicable time period three consecutive months when the child is under four years of age. *See* 2023 Tenn. Pub. Acts, Ch. 373 § 1 (H.B. 163).

on April 27, 2021." Although the court did not specifically identify the dates of the applicable determinative period of four months preceding the petition's filing, we determine such error to be harmless because the court "made sufficient findings of fact that encompassed the correct determinative period." *See In re Elijah F.*, No. M2022-00191-COA-R3-PT, 2022 WL 16859543, at *5 (Tenn. Ct. App. Nov. 10, 2022). We note that in this case, the relevant four-month statutory period for determining whether abandonment occurred would be July 17, 2022, to November 16, 2022 ("Determinative Period"). *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the applicable four-month statutory period preceding filing of the termination petition ends on the day preceding filing).

Reviewing the evidence presented regarding this statutory ground, we rely on the testimony of Mother, who acknowledged that she had never provided any type of financial or in-kind support for the Child since the Child entered DCS custody. Mother indicated that Ms. Royal, the DCS family services worker, had recently asked her to purchase clothing items for the Child. Mother claimed that she had done so but was waiting for Ms. Royal to retrieve the items. Notwithstanding this testimony, Mother admitted having provided no support during the Determinative Period.

Mother also acknowledged that she received $914 per month in Social Security disability benefits. Although Mother had not tendered any support for the benefit of the Child, she claimed to consistently pay some support for another child who continued in the custody of a friend. Importantly, Mother submitted no evidence demonstrating that she was unable to provide support for the Child despite having raised the affirmative defense of lack of willfulness respecting this ground. In fact, Mother presented the court with no information whatsoever concerning her financial situation, except her assertion that she had purchased school uniforms for another child and also that she regularly fed and supported that child.

On appeal, Mother urges that the trial court erred by failing to make findings regarding Mother's affirmative defense of lack of willfulness when determining that the ground of abandonment by failure to support had been proven. As this Court has previously explained regarding willfulness:

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child.

- 15 -

*In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (internal citations and footnotes omitted).

With respect to the defense of lack of willfulness, Tennessee Code Annotated § 36-1-102(1)(I) (West July 1, 2022, to current) provides:

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Here, Mother properly raised lack of willfulness as an affirmative defense to the abandonment grounds through her answer. Although the trial court expressly determined in its termination order that abandonment by failure to support had been proven by clear and convincing evidence, the court did not address Mother's willfulness defense.

During its oral ruling at the conclusion of trial, however, the trial court made the following statements concerning Mother's affirmative defense:

> I note that her attorney has filed an affirmative defense that says that the failure to visit or support was not willful. Failure to visit no longer needs to be found to be willful.
>
> * * *
>
> Mother was aware, I guess, she was to provide some things for the child, the shoes and things of that nature had been requested, and I think the testimony was that she was not able to provide any of those things. So, that aspect of abandonment has been met. And as I say, willful is not part of abandonment anymore when it comes to visiting, and I'm going to find that the ground of abandonment has also been met by clear and convincing evidence.

As Mother points out in her appellate brief, these statements, coupled with the trial court's failure to make any findings concerning the statutory defense of lack of willfulness in its written order, have impeded our ability to discern whether the trial court determined that Mother had failed to meet her burden of proof concerning this defense, or whether the court erroneously believed that willfulness was not to be considered when analyzing the statutory grounds of abandonment by failure to support and visit even

- 16 -

though lack of willfulness was properly raised as an affirmative defense pursuant to the statute.

In a previous case wherein the trial court failed to make any findings of fact addressing the parent's affirmative defense of lack of willfulness concerning the statutory ground of abandonment by failure to support, this Court elucidated:

> Relevant to this [abandonment] ground, the trial court determined that Mother had provided no financial support during the three-year period Grandparents had maintained custody of the Child. However, the court did not include findings of fact or conclusions of law addressing Mother's affirmative defense of lack of willfulness. Specifically, the court failed to address Mother's contention that Grandparents made her "feel" as though they would not accept her offers of support. Considering that Mother raised the affirmative defense of lack of willfulness during trial and in her proposed order, the court should have concluded in its final order whether Mother carried her burden to establish by a preponderance of evidence that she did not willfully fail to support the Child during the Determinative Period. *See* Tenn. Code Ann. § 36-1-102(1)(I). We therefore must reverse the court's finding of this statutory ground of abandonment.

*In re Elijah F.*, 2022 WL 16859543, at *8.

Similarly, here, inasmuch as Mother raised the affirmative defense of lack of willfulness through her answer and at trial, the trial court should have included findings stating whether Mother met her burden of proof concerning this affirmative defense. Although we could conduct our own independent review of the evidence to determine where the preponderance lies concerning lack of willfulness, we conclude that such review would be inappropriate given the trial court's erroneous statements concerning willfulness and our resultant inability to discern whether the trial court considered this statutory affirmative defense to the abandonment grounds. Therefore, because the trial court failed to make findings of fact concerning Mother's lack of willfulness defense when determining that this ground had been proven, we must reverse the court's finding of abandonment by failure to support.

### 2. Abandonment by Failure to Visit

In its termination order, the trial court found that Mother had failed to visit the Child since January 2022, a period encompassing the Determinative Period as described above. We again note, however, that the trial court failed to make any findings regarding Mother's affirmative defense of lack of willfulness when determining that this statutory ground had been proven. Accordingly, for the same reason articulated above, we must reverse this abandonment ground as well. However, having determined that other

grounds for termination of Mother's parental rights exist and because only a single ground for termination need be proven, *see in re Joseph G.*, 2013 WL 3964167, at \*7, we will proceed to review the trial court's best interest analysis.

## VI. Best Interest of the Child

When, as here, a parent has been deemed unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (West July 1, 2022, to current) lists the following factors for consideration:

(A)     The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)     Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)     Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

- 18 -

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual,

emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these

statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its final judgment, the trial court weighed nearly all of the twenty best interest factors in favor of terminating Mother's parental rights. Upon our thorough review of the evidence presented, we determine that the trial court's findings regarding the best interest factors are supported by a preponderance of the evidence.

Concerning factor (A), the court found that termination of Mother's parental rights would support the Child's critical need for stability and continuity of placement, stating: "This step is the first step toward moving the child toward adoption by her foster parents, . . . [who] wish to adopt [the Child]." Foster Mother testified that the Child had been residing with her and her husband since the Child entered custody as an infant in April 2021. She further testified that the Child was thriving in their home and was "happy and healthy." Foster Mother stated unequivocally that she and her husband wished to adopt

- 21 -

the Child.  We therefore conclude that the evidence preponderates in favor of the trial court's finding related to factor (A).

Additionally, the trial court weighed factor (B) in favor of termination, and we determine that the evidence preponderates in support of this finding.  Mother had never established that she could provide the Child with a stable home environment during the twenty-eight months that the Child was in custody prior to trial.  The court found that removing the Child from the foster parents would be detrimental because she had been in their care for essentially her entire life, and we agree.  Ms. Williams testified that she had observed the Child with the foster parents and stated that the Child was very attached to them and referred to them as "mommy and daddy."  She further articulated that the Child enjoyed a "great" connection with her foster parents and loved to talk with them and give them hugs.  Ms. Royal likewise testified that she had observed the Child with her foster parents, describing the Child as "very happy and content."  According to Ms. Royal, the Child maintained a very close and healthy attachment with the foster parents.  The evidence therefore demonstrated that the Child and the foster parents were bonded and that the Child was happy in their home.

The findings related to factor (B) also relate to factor (T), whether the mental or emotional fitness of the parent would be a detriment to the Child.  As previously explained, the Child was placed into DCS custody due to Mother's mental health crisis and her inability to care for the Child.  Mother had not, by the time of trial, demonstrated that she was able to care for the Child.  Moreover, Mother acknowledged that she had been in a mental health facility as recently as six months prior to trial, and although she stated that she was attending follow-up appointments, she did not demonstrate that her mental health concerns had been remedied sufficiently to enable her to safely parent the Child.  The evidence supports the trial court's finding that Mother's mental health issues prevented her from creating a safe and stable environment to which the Child could return.

Regarding factor (C), which is related to factor (A), the trial court found that Mother had not demonstrated any continuity and stability in meeting the Child's needs.  The evidence preponderates in favor of this finding.  Over the course of more than two years, Mother's whereabouts were unknown to DCS for several months at a time, and she apparently experienced two or three periods of residence in a mental health treatment facility.  Mother failed to establish a suitable home for the Child, failed to stay in contact with DCS or the foster parents, and failed to consistently visit or support the Child.  As the trial court found, Mother "has not demonstrated any stability in her circumstances, and she does not have an appropriate recognition of the child's needs."  Accordingly, the evidence supports the trial court's determination that this factor weighs in favor of termination.

With respect to factors (D) and (H), the trial court determined that the Child did not have a secure and healthy parental attachment to Mother but that she did maintain a healthy parental attachment to the foster parents. As the trial court found: "[The Child] calls her foster parents 'mommy and daddy.' The Court finds it would be detrimental to change caregivers at this stage of the Child's life. [The foster parents] are the only caregivers that [the Child] knows." Our review of the evidence preponderates in favor of these findings as well.

Concerning factor (E), the trial court found that Mother had not maintained visitation and contact with the Child. We agree. Despite her many opportunities to visit the Child, both virtual and in person, Mother failed to avail herself of the visits offered and failed to maintain contact with the Child, Foster Mother, and DCS. By the time of trial, Mother had not visited the Child in more than a year. As the trial court explained, Mother had "not maintained regular visitation or other contact with the child and did not use the visitation or other contact to cultivate a positive relationship with the child." The evidence thus preponderates in favor of the trial court's finding relative to this factor.

Regarding factor (F), whether the child is fearful of living in the parent's home, and factor (G), "[w]hether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms," the trial court determined that the Child had no reason to fear Mother and that there was no evidence that Mother's living situation would further traumatize the Child. We agree inasmuch as the Child was days old upon entering DCS custody and held no memory of having been in Mother's custody or home or of having been traumatized by Mother. Although a change of caretakers and environment would clearly be distressing for the Child because of her early and lengthy period of foster care, *see* factor (B), there was no evidence that she had experienced or could remember having experienced trauma in Mother's custody. Ergo, we agree with the trial court that these factors do not weigh in favor of termination.

The trial court found that the evidence related to factor (I) demonstrated that the Child enjoyed emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings. The court referenced the testimony from Foster Mother that the Child had been able to see her biological siblings, which the court described as "outstanding" for the Child. We further note the evidence in the record demonstrating that the Child was also bonded to her foster sibling, who had come into the foster parents' physical custody near the time the Child had. Based on all of the proof presented, we conclude that the evidence preponderates in favor of the trial court's findings with respect to this factor.

With regard to factor (J), the trial court found that Mother had not made any adjustment of circumstances to render her home safe for the Child. We note that no evidence was presented during trial concerning Mother's current home or living situation.

A recent attempt by Ms. Royal to visit Mother's home had been unsuccessful. Mother failed to demonstrate that she had completed the requirements of the permanency plans or that she had sufficiently addressed her mental health issues. Ergo, we agree that Mother has not made an adjustment of circumstances to render her home safe for the Child given the proof presented during trial.

Concerning factor (K), the trial court determined that Mother "has not taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions. Although [Mother] has stated she has taken advantage of programs in the community, she has not provided any proof of what services she has utilized." Based upon the evidence presented, we agree. We further note that relative to factor (L), DCS was hindered in its efforts to assist Mother because she failed to maintain contact and her whereabouts were unknown during a substantial portion of the custody period. We agree with the trial court's conclusion that DCS "acted appropriately under the circumstances." For these reasons, we determine that the evidence supports the trial court's findings as to these factors.

Factor (M) relates to Mother's sense of urgency or lack thereof. The trial court found that Mother had not demonstrated a sense of urgency during the more than two years since the Child's removal. Although DCS attempted to inform Mother about meetings and hearings, Mother rarely appeared for any of the scheduled occurrences until the termination hearing. Mother was also offered visits with the Child but failed to avail herself of opportunities to establish the parent-child relationship. Mother failed to complete her permanency plans tasks, and she provided no proof that her mental health issues had been improved. The evidence therefore preponderates in favor of the court's findings as to this factor.

The trial court found factor (N), concerning whether Mother had "shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child," to be inapplicable. We agree for the simple reason that the Child was placed into DCS custody from the hospital when she was days old. With respect to factor (O), however, the fact that the Child had been in DCS custody for essentially her entire life demonstrates that Mother had never afforded the Child safe and stable care. Regarding other children, as the trial court found, Mother acknowledged that she had "seven other children and none are in her home."[6] Upon our careful review of the evidence, we conclude that the proof preponderates in favor of the trial court's findings with respect to these factors.

Concerning factors (P) and (Q), the trial court determined that Mother had not demonstrated an understanding of the basic and specific needs of the Child or a

---

[6] We note that the juvenile court file, entered as Exhibit 2 at trial, contains certain documents relating to another of Mother's children; however, we have not considered those records when reviewing the facts in this matter and find them to have been improperly included in Exhibit 2.

commitment to creating and maintaining a home that would meet the Child's fundamental and specific needs. As the court found, Mother had not accomplished any steps to create or maintain a home that would meet the Child's needs. Although Mother could "articulate resources that she could utilize for services" and provided "general information to the Court," she failed to provide information specific to the Child's needs. We therefore agree with the trial court that Mother neither understood nor committed to providing what the Child required to thrive. These findings also support the court's determination that pursuant to factor (R), the physical environment of Mother's home was unknown because DCS had never been able to conduct a home study. Finally, with respect to factor (S), Mother admitted at trial that she had never provided any financial support for the Child.

Considering the applicable factors, we conclude that the evidence weighs in favor of terminating Mother's parental rights to the Child. In the more than two years following the Child's removal, Mother demonstrated little urgency in seeking remedies to her mental health issues or providing a suitable and safe home for the Child. Mother's accomplishments with respect to the requirements of her permanency plans were non-existent or negligible by the time of trial. She had failed to maintain contact with the Child, her caregivers, or DCS; had paid no support; and had generally failed to demonstrate that she would be able to adequately care for the Child. We therefore affirm the trial court's finding by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

## VII. Conclusion

For the foregoing reasons, we reverse the trial court's finding of the statutory grounds of abandonment by failure to support and abandonment by failure to visit. We affirm the trial court's judgment in all other respects. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights to the Child and collection of costs assessed below. Costs on appeal are assessed to the appellant, Marissa Y.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE